# EXHIBIT "A"

UNITED STATES DISTRICT COURT

~~NORTHERN DISTRICT OF CALIFORNIA~~

SAN JOSE FACILITY


ELIEL PAULINO,

     Plaintiff,

  vs.                          No. CV 16-02642-NC

MARCO CRUZ, INDIVIDUALLY AND AS AN
OFFICER OF THE SAN JOSE POLICE
DEPARTMENT, GERARDO SILVA,
INDIVIDUALLY AND AS AN OFFICER OF
THE SAN JOSE POLICE DEPARTMENT,
GURBAKSH SOHAL, INDIVIDUALLY AND
AS AN OFFICER OF THE SAN JOSE
POLICE DEPARTMENT, AND DOES 1 -
10, INCLUSIVE,

     Defendants.

_____/


DEPOSITION OF GURBAKSH SOHAL


Date:            Wednesday, October 19, 2016

Time:           10:03 a.m.

Location:      LAW OFFICE OF MORALES & LEANOS

                 75 East Santa Clara Street

                 Suite 250

                 San Jose, CA 95113


Reported by:   TERRY deDIEGO

               Certified Shorthand Reporter

               License No. 5569

**Paragon Reporting Services**
Certified Shorthand Reporters
210 North Fourth Street, Suite 201
San Jose, CA 95112
(408) 295-8301
(800) 590-9958
Fax: (408) 295-4544
Paragoncsr@aol.com

CERTIFIED COPY

1        Q.   Because I see you are trying to divide your

2    attention between me and the camera, but whatever is

3    easier for you works for everybody here.

4        A.   Understood.

5        Q.   The materials we talked about, your police

6    report, the CAD event, the photographs, the video, did

7    you use those to refresh your recollection and prepare

8    you for today?

9        A.   For today, yes.

10        Q.   Okay.  At some point, I may visit or introduce

11    those -- those materials to ask you some questions, and

12    you will have an opportunity to refresh your

13    recollection, if necessary.  Okay?

14        A.   Okay.

15        Q.   All right.

16             Now, do you recall when this incident occurred?

17        A.   Yes.

18        Q.   And what date was that?

19        A.   August 16th of 2015.

20        Q.   Okay.  And was it morning, noon or night, to

21    the best of your recollection?

22        A.   I believe it was approximately 0208 hours, so

23    early morning.

24        Q.   Okay.  And in normal people's time, what would

25    0208 hours mean?

                                                        12

1        A.   2:00 o'clock, 2:08 a.m.

2        Q.   Okay.  So in the early morning hours?

3        A.   Correct.

4        Q.   Okay.  And do you recall the location of this

5    particular event?

6        A.   Yes.

7        Q.   And that location?

8        A.   It was the area of Cadillac and Winchester

9    around the complex of 3137 and 3145, uh, Cadillac.

10        Q.   Cadillac Drive?

11        A.   Uh, I believe so.

12        Q.   Okay.  Is that here in San Jose?

13        A.   Yes, it is.

14        Q.   Now, did you prepare a report in relation to

15    this matter?

16        A.   I did.

17            MR. LEANOS:  Madam reporter, if we can have the

18    next exhibit marked.

19            (Police report marked Plaintiff's Exhibit 2 for

20    identification.)

21        Q.   (By Mr. Leanos):  And I will call you -- I will

22    refer to you as Officer Sohal.

23            I am going to show you what has been marked as

24    Plaintiff's Exhibit 2.

25            Just have you take a few minutes or a few

                                                          13

Paragon Reporting Services (408) 295-8301

1     A.   There is no audio and very grainy.  You can
2  barely see what is going on.
3     Q.   Okay.  So the video itself is grainy; is that
4  what your testimony is?
5     A.   Yes, it is grainy.
6     Q.   Okay.  And the video, there is no audio?
7     A.   There is no audio.
8     Q.   Aside from those two elements, is the video an
9  accurate depiction of what occurred on the morning of
10 August 16th, 2015, when Mr. Paulino was taken into
11 custody?
12    A.   In my belief, no.
13    Q.   And why not?
14    A.   It doesn't show, uh, Mr. Paulino, uh, resisting
15 and actively preventing us from obtaining his arm.
16    Q.   Okay.  So your testimony is this video doesn't
17 show Mr. Paulino resisting?
18    A.   Yeah, you do not see that in the video.
19    Q.   Okay.  And it doesn't show what else?
20    A.   Him actively resisting and preventing us from
21 obtaining his arm and taking him into custody.
22    Q.   Okay.  So your testimony today is that at the
23 time that that video was shown, Mr. Paulino was actively
24 resisting arrest?
25    A.   Correct.

62

Gurbaksh  Sohal  (October 19, 2016)

1      Q.   And he was also trying to prevent you from

2   taking him into custody?

3      A.   My testimony is that at that time where that

4   video shows, that Mr. Paulino was actively resisting and

5   preventing me from taking him into custody and possibly

6   harming himself.

7      Q.   At what point in the video that we can't see is

8   Mr. Paulino actively resisting?

9      A.   From the point that Officer Cruz tries to grab

10   his arm to the point where we place him into handcuffs.

11      Q.   Are you aware that there was a civilian witness

12   that also saw the events between you and Mr. Paulino?

13      A.   That -- your civilian witness you are referring

14   to, is it his father?

15      Q.   No.  Are you -- do you know a person named Jose

16   Ramirez?

17      A.   No.

18      Q.   Do you know if the person who took the video

19   was named Jose Ramirez?

20      A.   No.

21      Q.   Are you aware that there is a civilian witness

22   named Jose Ramirez who saw the incident between you and

23   Mr. Paulino on the morning of August 16th, 2015?

24      A.   I am not aware.

25      Q.   So I just want to make sure I understand your

63

1    testimony.

2         So your testimony today here is that that video

3    is not an accurate representation of this incident?

4         A.   Maybe -- can you explain what you mean by what

5    "accurate" means as far as --

6         Q.   I'm sorry.

7         A.   The video is a video.  I am not disputing the

8    fact that it captured the incident.  But it doesn't, in

9    my words, accurately describe what was going on, because

10   you do not see Mr. Paulino actively resisting,

11   preventing us from grabbing his arms, and disobeying our

12   commands and actually physically taken into custody.

13        Q.   Okay.  So now, going back to the night of the

14   incident, before the actual physical interaction between

15   you or between Officer Cruz and Mr. Paulino occurred,

16   Mr. Paulino had been stopped or at least detained for

17   about approximately eight minutes; correct?

18        MS. CHOW:  Objection.  Vague.

19        Go ahead.

20        THE WITNESS:  I would have to look at the, uh,

21   the time stamps, but it was possibly around that time

22   frame.

23        MR. LEANOS:  Okay.

24        Q.   (By Mr. Leanos):  And during those eight

25   minutes, was he complying with your orders?

                                                          64

Gurbaksh  Sohal   (October 19, 2016)

1      A.   Depends on what you mean by "complying," what

2  orders you are referring to.

3      Q.   Well, let's see, you told him to stay in his

4  car when you first made contact with him?

5           MS. CHOW:   Objection.   Assumes facts not in

6  evidence.

7           MR. LEANOS:   I'm sorry.

8           MS. CHOW:   Go ahead.

9      Q.   (By Mr. Leanos):   You told him to stay in his

10  truck when you first made contact with him?

11          MS. CHOW:   Same objection.

12          Go ahead.

13          THE WITNESS:   My first contact with him was my

14  activation of lights and sirens, which was on Cadillac

15  Drive.

16          The subject refused to pull over immediately to

17  the right-hand side, continued to drive down the alley

18  way.   We had repeated horns.   He refused to pull over

19  and stop when we had the horns.   He then made a

20  right-hand turn and refused to pull over there.   He then

21  made a left-hand turn into a parking spot, and at that

22  point he immediately already failed to yield to

23  emergency lights and sirens.   And did not -- was not

24  complying.

25      Q.   (By Mr. Leanos):   Officer Sohal, can you baton

65

Paragon Reporting Services (408) 295-8301

1    someone for refusing to pull over their vehicle?

2              MS. CHOW:  Objection.  Calls for hypothetical.

3              Go ahead.

4              THE WITNESS:  No.

5         Q.  (By Mr. Leanos):  Now, from when you first

6    turned on your emergency lights to where you say he then

7    turned into an apartment complex and then went into a

8    parking spot, I believe, under a carport, how long did

9    that take, approximate?

10        A.  Maybe 30 seconds.

11        Q.  Okay.  So from when you first wanted to pull

12   him over to where he actually parked his car, 30 seconds

13   passed?

14        A.  Approximately.

15        Q.  Why was he being pulled over?

16        A.  He did not have a proper functioning license

17   plate light, it was not legible from, uh, 50 feet.

18        Q.  So were you driving or were you the passenger

19   that night?

20        A.  I was driving.

21        Q.  Okay.  And who noticed that his license plate

22   light wasn't functioning?

23        A.  I noticed it as well as -- I can't speak on

24   what Officer Silva, I guess.

25        Q.  You noticed it?

                                                        66

Gurbaksh Sohal  (October 19, 2016)

1        Go ahead.

2        THE WITNESS:  Pulled him over for the not

3    working, the not properly functioning license plate

4    light.

5        Q.  (By Mr. Leanos):  Did you ever observe him

6    speeding prior to pulling him over?

7        A.  I don't recall that.

8        Q.  Do you recall him weaving or driving recklessly

9    before you pulled him over?

10       A.  I just noticed the license plate light and

11   conducted a traffic enforcement stop for that violation.

12       Q.  Now, when you saw the vehicle, did you

13   recognize that vehicle?

14       A.  No.

15       Q.  Had you had any prior contacts with that

16   vehicle?

17       A.  No, not that I recall.

18       Q.  And we keep saying -- I said "car," it was a

19   mistake.  It is actually like an SUV or would that be

20   fair to say?

21       A.  Yeah, it is an SUV.

22       Q.  Okay.  Prior to August 16th, 2015, had you ever

23   had any prior contacts with Mr. Paulino?

24       A.  Not that I recall.

25       Q.  Prior to August 16th, 2015, had you ever had

                                                      68

1    any prior contacts with 3137 Cadillac Drive, Apartment

2    16?

3         A.   Um, very familiar with that complex and that

4    area.  Um, but not specifically with 3137, Apartment 16.

5              MR. LEANOS:  I would like to take a break.  We

6    have been going for about an hour.

7              THE VIDEOGRAPHER:  We are going off the record.

8    The time is 11:15 a.m.

9              (Recess taken.)

10             THE VIDEOGRAPHER:  We are back on the record.

11   11:23 a.m.

12             Please proceed.

13        Q.   (By Mr. Leanos):  Thank you.

14             Officer Sohal, we basically, I think, finished

15   the last session with you seeing the video and you

16   indicating that the video is not necessarily an accurate

17   depiction of what occurred, because it doesn't show

18   Mr. Paulino resisting or refusing to obey your verbal

19   commands; correct?

20        A.   Verbal and, uh, physical attempts to remove his

21   arm.

22        Q.   Now, I want to come back now to your police

23   report.

24             You have a copy of that?

25        A.   Yes, I do.

69

1        Q.   I am going to ask you some questions about your

2   police report.

3             What I would like you to do is bring your

4   attention to the investigation of narrative facts

5   section which, I believe, is Bates-stamped SJ 0023.

6             Are you on that page?

7        A.   I am.

8        Q.   Okay.   So just in terms of your report, if we

9   look at the first paragraph, apparently it indicates

10  that you and Officer Silva were in a two-man patrol

11  vehicle when you saw Mr. Paulino's vehicle; correct?

12       A.   That's correct.

13       Q.   And then you decided because of the license

14  plate light not working, that you would pull him over to

15  investigate; correct?

16       A.   We conducted a traffic enforcement stop for

17  that violation.

18       Q.   Now, I want to then talk to you about paragraph

19  two.   Okay.   Which is the next paragraph down.

20            There is a paragraph there where you say this

21  area of the vehicle stop is known as a gang area, and

22  then you reference something, I think it is pronounced

23  Sur, which is S-u-r, trece, which is t-r-e-c-e, and then

24  Sureno, which is s-u-r-e-n-o.

25            Do you see that in your -- in your police

                                                        70

1       Q.   (By Mr. Leanos):   Now, so you believe that the

2    fact that Mr. Paulino was near a -- I guess a gang area,

3    you believe that was relevant to include in your police

4    report?

5       A.   Yes.

6       Q.   Is everyone who lives in this area a gang

7    member?

8            MS. CHOW:   Objection.   Calls for hypothetical.

9            Go ahead.

10           THE WITNESS:   I don't know everyone that lives

11   in that area, but based off of being around that area

12   and having contacts, I know that everyone is not a gang

13   member.

14           MR. LEANOS:   Okay.

15      Q.   (By Mr. Leanos):   So I just want to make sure I

16   understand your testimony.

17           So not everyone who lives in that area is a

18   gang member; is that true?

19      A.   I do not believe everyone that lives in that

20   area is a gang member.

21      Q.   As a matter of fact, Mr. Paulino is not a gang

22   member that you know of, is he?

23           MS. CHOW:   Objection.   Calls for speculation.

24           Go ahead.

25           THE WITNESS:   From what I observed, I did not

72

Gurbaksh  Sohal  (October 19, 2016)

1   believe to think he was a gang member.

2        Q.   (By Mr. Leanos):  He wasn't dressed like a gang

3   member, was he?

4        A.   From what I recall, he was not.

5        Q.   He wasn't wearing gang colors, was he?

6        A.   From what I recall, there was nothing that he

7   was wearing that made me believe he was a gang member.

8        Q.   Yet you can't -- it wouldn't be appropriate to

9   baton someone just because they lived in a gang area,

10  would it?

11            MS. CHOW:  Objection.  Calls for --

12  argumentative.

13            Go ahead.

14            THE WITNESS:  Can you repeat the question.

15       Q.   (By Mr. Leanos):  Sure.  Would it be

16  appropriate for an officer to use his baton on someone

17  just because they lived in a gang area?

18            MS. CHOW:  Objection.  Also calls for

19  hypothetical.

20            Go ahead.

21            THE WITNESS:  It would not be appropriate just

22  to baton just to be a gang member.

23       Q.   (By Mr. Leanos):  I think that's a little bit

24  different.

25            It would not be appropriate to baton someone

73

1    vehicle?

2         A.  I do not recall.

3         Q.  Do you know if Mr. Paulino exited his vehicle

4    immediately?

5         A.  I believe it was once we called him back to our

6    vehicle.

7         Q.  So after he parked in the carport, he stayed in

8    his vehicle?

9         A.  For a time period, yes.

10         Q.  Okay.  And then eventually, was it you or was

11    it Officer Silva who asked him to exit his vehicle, if

12    you recall?

13         A.  Don't recall.  I believe it was Officer Silva.

14         Q.  Okay.  And when Officer Silva asked Mr. Paulino

15    to exit his vehicle, did Mr. Paulino comply with his

16    order?

17         A.  Um, he did exit his vehicle, yes.

18         Q.  And when he ordered -- or when he exited his

19    vehicle, where did he go?

20         A.  He came to the front right quarter panel region

21    of our vehicle.

22         Q.  And is that where you had directed him to go?

23              MS. CHOW:  Objection.  Misstates prior

24    testimony.

25              THE WITNESS:  Uh, we -- he was asked to step

                                                        78

1    you believe he was agitated?

2        A.   I noticed his facial expressions, um, that, you

3    know, he was just, you know, what I perceived from the

4    way he reacted as he was walking towards us that you

5    know he was agitated, that he was, you know, during our

6    stop.

7        Q.   Did he say anything to you specifically that

8    you thought was appeared agitating?

9        A.   Not that I recall.

10       Q.   Did he threaten you or threaten Officer Silva?

11       A.   Not that I recall.

12       Q.   Was he acting belligerent in any way?

13       A.   Not that I recall.

14       Q.   Now, next paragraph, you basically mention that

15   Mr. Paulino was wearing loose jeans with bulges in it

16   and that he had a T-shirt on, so you did a quick cursory

17   pat search; correct?

18       A.   Correct.

19       Q.   What do you do during a cursory pat search?

20       A.   Uh, we are doing an outer clothing, um, pat

21   down search for weapons, anything that would

22   immediately, uh, put myself or the other officers in

23   danger.

24       Q.   And you mentioned that his jeans that there

25   were bulges, where were the bulges?

                                                          82

Paragon Reporting Services (408) 295-8301

1      A.   In his pockets.

2      Q.   So did you check the bulges when you did the

3  pat search?

4      A.   I do an outside of a clothing pat down of those

5  bulges, um, just to see if I could immediately recognize

6  it to be a weapon.

7      Q.   Did you locate anything that you considered to

8  be a weapon?

9      A.   Not during the pat search, no.

10     Q.   Did you check his legs, also, and his socks

11  when you do the pat search?

12     A.   Yes, I did.

13     Q.   Locate anything that would appear to be a

14  weapon?

15     A.   No, I did not.

16     Q.   Did you check his pockets?

17     A.   I did not go inside his pockets.  That's out of

18  my scope in the pat search.

19     Q.   Did you check the outside of his pockets?

20     A.   I did a pat search, yes.

21     Q.   How about his waistband, did you check his

22  waistband?

23     A.   I went along his, uh, belt line.

24     Q.   So would that be the waistband?

25     A.   Yes.

                                                      83

Gurbaksh Sohal (October 19, 2016)

Paragon Reporting Services (408) 295-8301

1    Q.   Did you locate any weapons?

2    A.   No, I did not.

3    Q.   Okay.  Did Mr. Paulino comply with you while

4    you were doing this search?

5    A.   Yes, there was nothing that made me feel that

6    --

7    Q.   So he was cooperative?

8    A.   At that point, yes.

9    Q.   Was he still agitated?

10   A.   Possibly, I don't recall.

11   Q.   After you pat search him, Mr. Paulino then

12   hands you his I.D. or hands Officer Silva his I.D.?

13   A.   Yes, he hands one of us his I.D.

14   Q.   And I believe either you or Officer Silva then

15   start asking him some more questions about his name and

16   date of birth?

17   A.   Correct.

18   Q.   And then at this point I believe Officer Silva

19   then, I think, maybe goes to the patrol car to check his

20   I.D.?

21   A.   Well, I believe there was a dispute about his

22   actual birth date.

23   Q.   What was that dispute?

24   A.   Paulino said he was born in 1986.  The I.D.

25   stated otherwise.

84

Paragon Reporting Services (408) 295-8301

1        A.   Very limited.

2        Q.   Were you able to speak with Mr. Paulino that

3    night in Spanish?

4        A.   For basic name and DOB information.

5        Q.   Now, I want to go down to paragraph eight,

6    which, I believe, is the second to last paragraph on

7    document 23.

8            At about five minutes into the stop, Officer

9    Cruz shows up to assist you and Officer Silva; correct?

10           MS. CHOW:   Okay.  Misstates what is in the

11   document.

12           Go ahead.

13           MR. LEANOS:   I'm sorry.

14       Q.   (By Mr. Leanos):  Is it -- according to your

15   paragraph eight, Officer Cruz responded to your scene to

16   assist in the DUI investigation; correct?

17       A.   Correct.

18       Q.   Now, did you ask Officer Cruz to join you or

19   did he just show up to assist you?

20       A.   Just showed up.

21       Q.   When Officer Cruz arrived, did you tell Officer

22   Cruz that you already had checked Mr. Paulino for

23   weapons?

24       A.   I did not.

25       Q.   Now, at some point, then, I believe, after

87

Gurbaksh Sohal  (October 19, 2016)

Paragon Reporting Services (408) 295-8301

1      Officer Cruz was there, Mr. Paulino is asked to move to

2      the right front quarter panel of the patrol vehicle; is

3      that fair?

4            A.   Correct.

5            Q.   Okay.  And does Mr. Paulino comply with that

6      order?

7            A.   Based on the video, he moves over.

8            Q.   And leans up against the patrol vehicle?

9            A.   He moves over to that general region.

10           Q.   And that's because the officer or Officer Silva

11     or somebody -- strike that.

12                Officer Cruz or someone asked him to move over

13     to the front of the vehicle?

14           A.   Yes, because --

15                MS. CHOW:  Calls for speculation.

16                Go ahead.

17                THE WITNESS:  Yeah, because his back would have

18     been to the open window with the, you know, subject in

19     there with an open threat, so he was just trying to get

20     to a point where he doesn't have to worry about having

21     his back to the open window where there could be

22     multitude of threats.

23           Q.   (By Mr. Leanos):  And Officer Cruz actually

24     stays with Mr. Paulino once he moves to the patrol

25     vehicle?

                                                            88

Gurbaksh Sohal (October 19, 2016)

1          Kind of like stays and watches him?

2      A.  Yes.

3      Q.  Okay.  And so Officer Cruz's job at that point

4  was to monitor Mr. Paulino, and then you went back to

5  the truck to -- to search it or review or look into it;

6  right?

7      A.  Yeah, Officer Cruz was there to assist us

8  because multitude of just the known area, and it is, you

9  know, make sure that we don't have someone where while

10  we are conducting our investigation that a threat does

11  not prevent itself and take us by surprise.

12     Q.  Okay.  So Officer Cruz stays with Mr. Paulino,

13  and then you go back to the truck to search?

14     A.  I go back to the truck, yes.

15     Q.  And Officer Silva at this point is still in the

16  patrol vehicle doing background information or looking

17  for Mr. Paulino's match or something?

18     A.  Yeah, we were trying to get a match trying to

19  figure out who Mr. -- confirm Mr. Paulino, the

20  information he provided us.

21     Q.  Okay.  Now, in paragraph nine, you basically

22  say that, you know, that Apartment 16 window -- back

23  window at 3137 Cadillac Drive that you observed

24  Mr. Paulino's father; is that correct?

25     A.  That's correct.

                                                        89

1       Q.   Okay.  And he was yelling at the officers?

2       A.   Yes, he was, uh, clearly agitated.  He was, um,

3   yelling and, uh, you know, appeared to be intoxicated,

4   uh, just very, uh, agitated.

5       Q.   Do you know what he was yelling?

6       A.   I do not know.

7       Q.   Do you know if he was yelling at anyone in

8   specific?

9       A.   It was towards our general area, but I don't

10  know what Mr. Paulino -- reference to Eliel --

11      Q.   Eliel?

12      A.   Eliel's father was thinking.

13      Q.   And do you recall if he said anything in

14  English?

15      A.   Not that I recall.

16      Q.   Now, at some point you went over to the window

17  just to look at Mr. Paulino's father and also to look

18  inside the apartment; correct?

19      A.   That's not correct.

20      Q.   Okay.  So at some point, did you approach the

21  window to observe anything?

22      A.   I did.

23      Q.   When did that happen?

24      A.   Happened while Mr. -- Officer Cruz was watching

25  Eliel.

                                                      90

1        Q.  And were you able to see Mr. Paulino -- strike

2    that.

3            Were you able to see Mr. Paulino's father

4    inside the apartment?

5        A.  Uh, yes, because he was also retreating out of

6    the apartment.

7        Q.  Okay.  And were you also able to look inside

8    the apartment at least in the area he was seated?

9        A.  Yeah, I tried to take a quick look around to

10    see if there was any threats, and I noticed a bunch of

11    beer cans in the kitchen.

12        Q.  Okay.  But -- you didn't see any weapons, but

13    you saw several beer cans?

14        A.  Uh, well, I mean, there is a kitchen.  There is

15    knives, those are potential weapons.

16        Q.  Did you see any knives when you looked into the

17    kitchen?

18        A.  Um, I don't recall.  I -- so long ago that at

19    this point, I don't remember.

20        Q.  Did -- and you said that Mr. Paulino's father

21    seemed agitated?

22        A.  Yes.

23        Q.  How was he acting agitated?

24        A.  Um, he was yelling at us.  I don't understand

25    Spanish, but he was talking at a very loud and

91

Gurbaksh Sohal  (October 19, 2016)