# EXHIBIT "C"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE FACILITY

ELIEL PAULINO,

    Plaintiff,

  vs.

MARCO CRUZ, INDIVIDUALLY AND AS AN OFFICER OF THE SAN JOSE POLICE DEPARTMENT, GERARDO SILVA, INDIVIDUALLY AND AS AN OFFICER OF THE SAN JOSE POLICE DEPARTMENT, GURBAKSH SOHAL, INDIVIDUALLY AND AS AN OFFICER OF THE SAN JOSE POLICE DEPARTMENT, AND DOES 1 - 10, INCLUSIVE,

    Defendants.

No. CV 16-02642-NC

DEPOSITION OF MARCO CRUZ

Date:      Tuesday, October 25, 2016
Time:      10:09 a.m.
Location:  LAW OFFICE OF MORALES & LEANOS
           75 East Santa Clara Street
           Suite 250
           San Jose, CA 95113

Reported by:  TERRY deDIEGO
              Certified Shorthand Reporter
              License No. 8978

Paragon Reporting Services
210 North Fourth Street, Suite 201
San Jose, CA 95112-5569
(408) 295-8301
(800) 590-9958
Fax: (408) 295-4544
Paragoncsr@aol.com

CERTIFIED COPY

Paragon Reporting Services (408) 295-8301

1  from the night of the incident?
2     A.  I don't remember what he looks like.
3     Q.  Okay.  Does that appear to be the apartment
4  window that you observed on the night of the incident?
5     A.  It could be.  I am not sure.
6     Q.  Okay.  Do you recognize the person in that
7  photograph?
8     A.  No.
9     Q.  Do you know anything about that person in the
10 photograph?
11    A.  No.
12    Q.  So just to back up a little bit, Officer Silva
13 is doing a background check, and what, he is inside the
14 patrol car at this point?
15    A.  Correct.
16    Q.  And then Officer Sohal is searching
17 Mr. Paulino's truck?
18    A.  Correct.
19    Q.  And then you are asked to keep your eye on
20 Mr. Paulino, his son?
21    A.  And his father.
22    Q.  Okay.  Now, at this point, is Mr. Paulino
23 handcuffed?
24    A.  No.
25    Q.  Do you know why he is not handcuffed?

1    A.   No.  They hadn't placed him under arrest yet
2  for --
3    Q.   So because it is just an investigation at this
4  point?
5    A.   Correct.
6    Q.   And he is just being detained?
7    A.   Correct.
8    Q.   Now, you knew this to be -- prior to getting
9  there, you knew this area to be a gang area and a drug
10 area; correct?
11   A.   Correct.
12   Q.   When they asked you to keep an eye on him, is
13 there a reason why you didn't handcuff Mr. Paulino?
14   A.   He was being fairly cooperative at the moment.
15   Q.   And by being cooperative, what do you mean?
16   A.   He was complying with our directions.
17   Q.   Okay.  And at some point, did you ask him to
18 move his body towards the front of the patrol car?
19   A.   Yes.
20   Q.   And did he do that?
21   A.   Yes.
22   Q.   Okay.  And at some point, did you ask him to
23 lean up against the patrol car?
24   A.   Yes.
25   Q.   And did he do that?

Paragon Reporting Services (408) 295-8301

1  A.  During -- um, before, prior to me getting
2  there.
3  Q.  Okay.  Did you ever see him try to exit the
4  window?
5  A.  No.
6  Q.  When you say the officers told me, are you
7  talking about Sohal and Silva?
8  A.  Yes.
9  Q.  Now, at some point, I believe you said, as you
10 are near Mr. Paulino, he is having a conversation with
11 the person who is inside the apartment?
12 A.  Correct.
13 Q.  And now we know that to be his father?
14 A.  Correct.
15 Q.  Okay.  And do you know what they were talking
16 about?
17 A.  No.
18 Q.  Was there a conversation in English or Spanish?
19 A.  In Spanish.
20 Q.  At some point while Mr. Paulino was having this
21 conversation, did you ever tell him to shut up?
22 A.  No.
23 Q.  Did you ever tell him to shut the fuck up?
24 A.  No.
25 Q.  What did you tell him?

68

Marc Cruz   (October 25, 2016)

1    A.  To stop talking.
2    Q.  Did you use those words, stop talking, or did
3 you say something different?
4    A.  Can I take a look at my report?
5    Q.  Would it refresh your recollect?
6    A.  Yes.
7    Q.  Feel free to do so, and maybe eight paragraphs
8 down.
9    A.  I asked him, no more talking, that's what I put
10 in my report.
11   Q.  Okay.  So you told Mr. Paulino, no more
12 talking?
13   A.  Correct.
14   Q.  Did you tell him in Spanish or English?
15   A.  In English.
16   Q.  And what was Mr. -- reaction, what was
17 Mr. Paulino's reaction to when you -- when you told him,
18 no more talking?
19   A.  The first time he continued talking.
20   Q.  Okay.
21   A.  Can I take a look at my report?
22   Q.  Yeah.  If it will refresh your recollection.
23       Feel free.  Take your time.
24   A.  After the second time, he turned, and he looked
25 at me, he had an angry look on his face, and he said

69

Paragon Reporting Services (408) 295-8301

1  something to me in Spanish aggressively.
2      Q.  Okay.  Let's talk about that.
3          How do you know he was angry?
4      A.  Based on my training and experience and
5  interactions with people, you can judge how their mood
6  is by their facial expressions.
7      Q.  So is it your testimony he had like an angry
8  look on his face when he said something to you?
9      A.  He had an angry expression on his face, yes.
10     Q.  And if you don't understand Spanish, how do you
11 know it was an aggressive tone?
12     A.  Based on my training and experience and
13 conversations with people even if they are speaking to
14 me in a different language, you can tell by the
15 fluctuation of their voice if they are -- if they are
16 happy or if they are sad or if they are angry.
17     Q.  So just based on maybe your common sense and
18 training?
19     A.  Correct.
20     Q.  When you told Mr. Paulino no more talking, was
21 he interfering with Officer Silva's investigation?
22         MS. CHOW:  Objection.  Vague.
23         Go ahead.
24         THE WITNESS:  No.
25     Q.  (By Mr. Leanos):  Was he interfering with

70

1  Officer Sohal's investigation?
2       A.  No.
3       Q.  Was Mr. Paulino interfering with the
4  investigation at all when you attempted to handcuff him?
5           MS. CHOW:  Objection.  Vague.  Assumes facts
6  not in evidence.
7           Go ahead.
8           THE WITNESS:  Sorry.  Can you repeat your
9  question one more time.
10      Q.  (By Mr. Leanos):  Was Mr. Paulino interfering
11  with the investigation at all when you attempted to
12  handcuff him?
13          MS. CHOW:  Same objections.
14          THE WITNESS:  I am sorry.  Can you repeat the
15  question up one more time.
16      Q.  (By Mr. Leanos):  Sure.  Was Mr. Paulino
17  interfering with the investigation at all when you
18  attempted to handcuff him?
19          MS. CHOW:  Same objections.
20          THE WITNESS:  Yes.
21      Q.  (By Mr. Leanos):  How?
22      A.  He was refusing to cooperate with my orders,
23  and I was asking him.
24      Q.  So by talking to his father, he was refusing to
25  comply with your orders?

1    A.  Correct.

2    Q.  And that was interfering with your

3 investigation?

4    A.  Correct.

5    Q.  Now, aside from talking to his father, was he

6 doing anything else that was interfering with your

7 investigation at that point?

8        MS. CHOW:  Objection.  Vague.

9        Go ahead.

10       THE WITNESS:  Just refused to -- when I asked

11 him to stop talking, he refused to -- continued to talk

12 to his father in Spanish.

13   Q.  (By Mr. Leanos):  But aside from that, did he

14 do anything else that was interfering with the

15 investigation?

16   A.  When I told him to turn around, to put his

17 hands around his back and handcuffed, he pulled away

18 from me.

19   Q.  We are not there yet.

20   A.  Okay.

21   Q.  We are talking about --

22   A.  Just the conversation.

23   Q.  Yes.  Just the conversation where you told

24 him -- I believe you said no more talking.

25       Did he do anything else to interfere with your

72

Marc Cruz   (October 25, 2016)

1  investigation?
2      A.  No.
3      Q.  Whose decision was -- who made the decision to
4  handcuff Mr. Paulino?
5      A.  It was mine.
6      Q.  What were you going to do with Mr. Paulino
7  after you handcuffed him?
8      A.  Place him in the back of the patrol car.
9      Q.  So you were placing him under arrest?
10     A.  No.
11     Q.  What were you doing?
12     A.  I was detaining him.
13     Q.  But by handcuffing him, aren't you placing him
14 under arrest?
15     A.  No.
16     Q.  So it is your testimony that handcuffing him
17 and placing him in the patrol car, which you were
18 intending to do, was just a detention?
19     A.  Correct.
20     Q.  And that would have been for talking to his
21 father?
22     A.  For officer safety reasons.
23     Q.  So what were the officer safety reasons that
24 you were going to place him in handcuffs?
25     A.  Since I don't speak Spanish or understand it, I

73

1  didn't know the context of their conversation, I didn't
2  know if -- well, first of all, we haven't identified him
3  yet, so we don't know just a regular person or if he is
4  wanted for murder or anything in between.
5      Since I don't understand or speak Spanish, I
6  didn't know the context of their conversation, so I
7  don't know if he was asking his dad, hey, look, the
8  officers aren't paying attention, why don't you come out
9  and we can fight them, or hey, move out of the way and
10 jump through the window, or we don't know, we don't know
11 who his father is or what is inside that apartment.  We
12 don't know if there is any weapons or how many people
13 are in there.
14     Don't know if he is asking his dad, hey, can
15 you go grab a bat or grab a gun or grab some other type
16 of object that can be used as a weapon to hurt us.
17     Q.  So it seems like you were fearing the worst?
18     A.  Correct.
19     Q.  Were you speculating that these were all
20 possibilities?
21         MS. CHOW:  Objection.  Argumentative.
22         Go ahead.
23         THE WITNESS:  Correct.  I was fearing the
24 worst, so that's what we are taught to do.
25     Q.  (By Mr. Leanos):  You are taught to fear the

74

1  he's basically complied with all the police orders?
2      A.  Complied with my police orders so far.  I don't
3  know about Sohal or Silva's.
4      Q.  Did Sohal and Silva ever tell you that
5  Mr. Paulino was not complying with their orders?
6      A.  Just prior to me walking up, yes.  When he
7  didn't pull over.
8      Q.  Okay.  After he pulled over in his carport, but
9  he had been complying with their orders?
10     A.  It appeared so, yes.
11     Q.  And at least for the five or six minutes that
12 you were there before this actual confrontation begins,
13 Mr. Paulino is complying with everyone's orders until
14 you ask him to stop talking?
15     A.  Appeared so, yes.
16     Q.  And why did you think Mr. Paulino was asking
17 his father for a weapon?
18     A.  I didn't.
19         MS. CHOW:  Misstates prior testimony.
20         THE WITNESS:  I didn't know what he was talking
21 to his dad about.
22     Q.  (By Mr. Leanos):  Why did you think that
23 Mr. Paulino would attempt to jump or flee into the
24 apartment?
25     A.  I don't know what Mr. -- the context of the

77

1  conversation was, and I don't know what Mr. Paulino was
2  thinking or we haven't even identified him yet.
3      Q.  Based on your training and experience, can you
4  arrest someone based on a hunch or just out of
5  speculation?
6          MS. CHOW:  Objection.  Vague and argumentative.
7          THE WITNESS:  No.
8      Q.  (By Mr. Leanos):  Do you know whether or not
9  Mr. Paulino was asking his father to lock up his truck
10 if he is arrested?
11     A.  No.
12     Q.  Do you know if Mr. Paulino was asking his
13 father to lock up his truck so no one would steel his
14 tools from work?
15     A.  No.
16     Q.  Now, at some point in your report, you mention
17 that you attempted to place Mr. Paulino in handcuffs,
18 and you approach him; correct?
19     A.  Correct.
20     Q.  And he brings up his left hand to his shoulder,
21 he clenches his fist, clenches his left hand into a fist
22 and clenches his right hand into a fist, stood straight
23 up and assumed a fighting stance.
24         Do you recall writing that in your report?
25     A.  Can I --

Paragon Reporting Services (408) 295-8301

1  Q. Yeah. And you can look at paragraph ten,
2  which, I believe, is Bates-stamped SJ 0008 and second
3  paragraph down.
4  A. Yes, I did write that.
5  Q. Okay. So looking at your report refreshes your
6  recollection?
7  A. Yes.
8  Q. Okay. So you basically said he appears to have
9  clenched his fists, stood straight and assumed the
10 fighting stance?
11 A. Correct.
12 Q. Does that -- is that action by Mr. Paulino, is
13 that shown on the video?
14 A. I don't know. I would have to take a look at
15 the video again.
16 Q. Okay. Did you look at the video after this
17 incident?
18 A. Correct.
19 Q. Do you recall if the video ever showed
20 Mr. Paulino actually taking a fighting stance?
21 A. I know it is dark in the video.
22 Q. So you don't know if the video shows that or
23 not?
24 A. It appears to look like it, yes.
25 Q. It appears to look like he is taking a fighting

79

Marc Cruz   (October 25, 2016)

Paragon Reporting Services (408) 295-8301

1  stance?
2      A.  Yes, from what I can recall.
3      Q.  From what you recall from the video?
4      A.  Yes.
5      Q.  Now, you had just been off probation for about
6  four months at this point; correct?
7      A.  Correct.
8      Q.  Okay.  And how many months had you been working
9  that shift, the graveyard shift?
10     A.  The graveyard shift?  Um, since I started,
11 except for two months.
12     Q.  So you had been working the graveyard shift for
13 about two months?
14     A.  No, for the majority of -- let me see this.  So
15 about a year and two months.
16     Q.  Okay.  So you had been working the graveyard
17 shift for a while, but you had only been working as an
18 officer not on patrol for four months?
19         MS. CHOW:  Objection.  Misstates prior
20 testimony.
21         THE WITNESS:  Yeah, can you rephrase that.
22         MR. LEANOS:  Yeah.  I may have stated it wrong.
23     Q.  (By Mr. Leanos):  You had been working the
24 graveyard shift for about a year and two months;
25 correct?

80

Marc Cruz   (October 25, 2016)

Paragon Reporting Services (408) 295-8301

1    A.   Correct.
2    Q.   Okay.  But you had only been off probation
3  about four months; right?
4    A.   Correct.
5    Q.   Okay.  That was -- now, I believe in your
6  report you say as you were going to arrest him or place
7  him in handcuffs, you believe he took a fighting stance.
8       You also said, based on your training and
9  experience, that Mr. Paulino was engaged or displaying
10 preassaultive indicators.
11      Do you recall writing that in your report,
12 something similar?
13   A.   Yes.
14   Q.   Where did you learn that term "preassaultive
15 indicators"?
16   A.   In the academy.
17   Q.   Okay.  And what behavior about Mr. Paulino did
18 you believe to be preassaultive?
19   A.   He made his hands into a fist.  He squared up
20 his hips and shoulder with me to a bladed stance with
21 one foot being forward and one foot being back.
22   Q.   And those were the movements that you
23 believed -- that you believed to be preassaultive
24 behavior?
25   A.   Correct.

81

Marc Cruz   (October 25, 2016)

```
 1            Did you see that in the video?
 2       A.   I saw, yeah, myself grab his left wrist.
 3       Q.   And he kind of gets pushed back a little bit?
 4       A.   He pulls away from me.
 5       Q.   And then it appears that as he pulls away from
 6  you, he is thrown into the police car.
 7            Did you see that in the video?
 8            MS. CHOW:  Objection.  The video states what it
 9  states.
10            THE WITNESS:  We ran into the car.  I did not
11  push him into the car.
12       Q.   (By Mr. Leanos):  Okay.  So your testimony here
13  today is, he ran -- Mr. Paulino ran into the car.
14            You did not push him in the car; is that
15  correct?
16       A.   Correct.  As he was pulling away from me, he
17  ran into the car.
18       Q.   Okay.  And was he running pretty fast?
19       A.   He was pulling way from me.  I don't know how
20  fast he was moving.
21       Q.   Well, he was -- the patrol car mirror -- side
22  view mirror broke; correct?
23       A.   Yes.
24       Q.   So he had to be going fast; right?
25       A.   No.  I don't know how much force it takes to
```

86